UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHWIKAR EL-HADARY, individually and on behalf of all others similarly situated,

    Plaintiff,

v.

XCHANGE, INC. (f/k/a EXCHANGE APPLICATIONS, INC.) ANDREW J. FRAWLEY, F. DANIEL HALEY, ROBIN GREEN, and DAVID G. McFARLANE,

    Defendants.

Case No.

**01-10322RWZ**

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff, by her attorneys, makes the following allegations upon information and belief (except as to the allegations specifically pertaining to the named plaintiff and her counsel), based upon the facts alleged below, which are predicated upon, *inter alia*, a review and analysis of relevant filings made by or on behalf of Xchange, Inc., formerly known as Exchange Applications, Inc. ("Xchange" or the "Company") with the Securities and Exchange Commission ("SEC"), press releases, news and analyst reports, and an investigation undertaken by plaintiff's counsel. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

### JURISDICTION AND VENUE

1. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a) (the "Exchange Act") and Rule 10b-5, 17 C.F.R. 240.10b-5 promulgated under Section 10(b) by the SEC.

2. This Court has jurisdiction of this action pursuant to Section 27 of the Exchange



Act, as amended, 15 U.S.C. §78aa.

3. Venue is properly laid in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of, including the preparation, issuance and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this judicial district. In addition, defendant Xchange maintains its corporate headquarters in this District in Boston, Massachusetts.

## PARTIES

### *Plaintiff*

4. Plaintiff Shwikar El-Hadary purchased common stock of Xchange, Inc. during the Class Period described herein as reflected in her Certification attached hereto, and suffered damages as a consequence.

### *Defendants*

5. Defendant Xchange develops and sells software and services in the eCustomer Relationships Management ("eCRM") industry, to assist companies doing business via the Internet with personalized customer communication and marketing compatibilities. Xchange is organized under the laws of the State of Delaware and maintains its corporate headquarters at 89 South Street, Boston, Massachusetts 02111. Xchange common stock is publicly traded on the NASDAQ National Market System, an efficient, open and developed market, under the trading symbol "EXAP." As of August 10, 2000, Xchange had approximately 31,465,785 shares of its common stock issued and outstanding.

6. Defendant Andrew J. Frawley ("Frawley") is Chief Executive Officer, Chairman of the Board, and a founder of the Company. Frawley beneficially owns approximately

2

1,521,502, or 6%, of the Company's common stock.

7.   Defendant F. Daniel Haley ("Haley") is currently Xchange's Chief Strategy Officer. During the Class Period, Haley served as Vice President for Growth and Emerging Markets and was designated as the Company's "Chief Deal Officer." Haley reports directly to Defendant Frawley.

8.   Defendant David F. McFarlane ("McFarlane") was the Company's President and Chief Operating Officer throughout the Class Period. McFarlane resigned as President and COO in January 2001.

9.   Defendant Robin Green ("Green") served as Senior Vice President, Solution Services throughout the Class Period and was appointed General Manager of the ASP Business Unit in October 2000.

10.   Defendants Frawley, Haley, McFarlane and Green are referred to collectively herein as "the Individual Defendants."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

11.   Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of herself and on behalf of all persons who purchased Xchange common stock (the "Class") from July 24, 2000 through September 29, 2000 (the "Class Period"). Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

12. The members of the Class are so numerous that joinder of all members is impracticable. There are over 31 million shares of Xchange common stock outstanding. Throughout the Class Period, Xchange common stock was actively traded on the NASDAQ National Market System. The precise number of class members is unknown to plaintiff at this time but class members are believed to number in the thousands. In addition, the names and addresses of the class members can be ascertained from the books and records of XChange and/or its stock transfer agent.

13. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no interests antagonistic to her fellow Class members. Plaintiff has retained competent counsel experienced in class action litigation under the securities laws to further ensure such protection and intend to prosecute this action vigorously.

14. Plaintiff's claims are typical of the claims of the other members of the Class because plaintiff's and all the class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants.

15. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficultly which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

16. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class are:

    a.    Whether the federal securities laws were violated by defendants' acts as alleged herein;

    b.    Whether public statements, documents, filings and releases disseminated by defendants to the investing public concerning Xchange omitted and/or misrepresented material facts; and

    c.    The extent of damages sustained by members of the Class and the appropriate measure thereof.

## FACTUAL ALLEGATIONS

### *Background*

17.    At least by July 24, 2000, Xchange was confronted with several known adverse events and trends that required the Company to adopt more conservative revenue recognition methods with respect to a steadily increasing portion of its new contracts than had historically been the case in order for their publicly reported financial statements to comply with generally accepted accounting principles ("GAAP").

18.    While the majority of the Company's revenue on software sale contracts had historically been fully recognized immediately upon execution of the contract and delivery of the subject software, prior to and continuing throughout the Class Period, the nature of the Company's sales had shifted to contracts which included substantial service components that required the revenue from such contracts be recorded on a "percentage-of-completion" method. Thus, while investors expected the Company to recognize revenue on the contracts which were announced and entered into before and during the Class Period as the Company had historically done, contrary

to this expectation and pursuant to GAAP, the nature of the contracts entered into by the Company during the Class Period precluded the Company from immediately recognizing revenues upon delivery. Rather, the income stream from these contracts would be deferred and spread out over several quarters or even years.

19. Also, as a consequence of the shift in the mix and nature of the contracts described above, XChange's products and services required increasing degrees of customization and tailoring to specific client needs causing the sales and implementation cycles to lengthen while full product delivery and functionality and customer acceptance was deferred. Accordingly, these factors substantially increased the known risks affecting, and the conditions precedent to, account collectibility.

20. Throughout the Class Period, however, as the Company's revenue recognition problems became aggravated, defendants continued to tout the contracts it entered into, report "record" financial results, make public statements that Xchange was continuing to meet and exceed revenue and profit goals, and misrepresent and omit material facts about Xchange's business, financial results and prospects, all of which perpetrated a fraud on plaintiff and the market for Xchange common stock during the Class Period as set forth below.

### *Defendants' Fraud During the Class Period*

21. On July 24, 2000, Xchange issued a press release over *PR Newswire* in which it announced "record financial results for the second quarter of 2000, its eighth consecutive quarter of increasing pro-forma profitability." In the July 24 release, defendants stated, among other things, the following:

Xchange's strong execution on the quarter is exemplified by the following metrics:

Sales to more than 35 companies, including nine existing clients who purchased additional components of the Xchange 4.0 suite for eCRM;

10 percent of orders from new clients were for multiple components of the Xchange 4.0 suite;

40 percent of clients selected Xchange 4.0 on a hosted basis; and

The company signed reseller or Value-Added Service Provider (VASP) deals with nine partners, demonstrating that Xchange is the de facto standard among leading eCRM service providers.

Xchange's total revenue for Q2 2000 was $19.6 million, an increase of 91 percent over Q2 1999. Software revenue increased 121% over Q2 1999 to $13.4 million, and comprised 68 percent of total revenue for the quarter. Services revenue for Q2 2000 was $6.3 million, an increase of 49% over Q2 1999. Pro forma net income, at $0.06 per share excluding costs associated with the amortization of extraordinary items, was up 167% over Q2 1999. Pro forma operating income, at $2.3 million, was up 200 percent over Q2 1999. These results include a two-week stub period for the CustomerAnalytics acquisition, which was announced in early June.

According to Andy Frawley, chairman and CEO of Xchange, "We're pleased to report another record quarter. The Xchange team executed flawlessly on its Q2 plan, achieving continued diversification of our account base, strong growth in our ASP business, and signing up several new key resellers for our eCRM solutions. During the quarter, we added 200 employees and signed on more than 35 clients including Circuit City Stores, Inc., Marks & Spencer and Away.com." Xchange currently employs more than 500 professionals, and has approximately 250 clients in 33 countries.

"Xchange continues to be one of the only profitable companies in the eCRM space," Frawley continued, "which we believe not only gives us an edge with clients and prospects, who enjoy a greater level of comfort when doing business with Xchange, but also provides investors with proof that we're committed to increasing shareholder value."

**Diversified geographies, orders and industries reaffirm Xchange's strength in the marketplace**

Xchange's commitment to increase its international presence, expand its solutions offerings and adapt its solutions for new vertical markets was apparent in Q2 2000. New software customers in Q2 included Bank of Ireland, Bank of Scotland, Libertel, Liberty, Heilig-Meyers, National Geographic and the U.S. Tennis Association. New ASP customers included Away.com, BareEscentuals, FreeShop.com and PictureVision. Xchange sold additional components of its eCRM solutions suite to nine existing clients, including Ameritrade and Bell Atlantic (which has merged

with GTE to form Verizon Communications). New and expanded VASP partners, who have purchased Xchange's software and will re-sell it as a service to their own clients, include Acxiom, ClientLogic, Donnelley Marketing, Epsilon, MessageMedia, NetPerceptions and EDS.

Xchange sold eight licenses for Xchange Optimizer, its new, vertical-specific analytics solution; and shipped Xchange Real Time to two clients. "We anticipate that sales of our analytics solution and Xchange Real Time will represent significant portions of Xchange's revenue by 2001," said Frawley. "Response to these solutions from our clients and prospects has been simply outstanding."

Via the acquisition of CustomerAnalytics, Xchange recently added local marketing capabilities to its eCRM solutions suite. By Q4 of 2000, Xchange plans to adapt and market this technology, originally developed for financial services firms, into additional vertical industries, including retail, travel and tourism, hotel management, brokerage and others. Frawley noted that moving eCRM technology into new vertical markets is nothing new for Xchange: originally focused on financial services, Xchange has successfully expanded its own client base dramatically in the past three years. "We've proven that we can execute well in new markets," noted Frawley.

**New partnerships playing a vital role in Xchange's growth**
During Q2, Xchange continued to aggressively develop its partner channel, signing or expanding reseller agreements with many major marketing industry firms. Aside from the VASP partnerships mentioned above, new and expanded partnerships in Q2 include:

> A co-marketing agreement with Vignette.
>
> A strategic partnership with Braun Consulting to enhance the Xchange Real Time™™ solution with an adapter to Clarify's call center software.
>
> Reseller agreements with NextClick and Hitachi.

"Partner relationships are a crucial part of our growth strategy," explained David McFarlane, president and COO of Xchange. "They not only represent recurring revenue streams for Xchange, but also increase the number of people selling Xchange services by an order of magnitude."

22. On July 25, 2000 and thereafter, based upon defendants' positive statements in the July 24 press release (and in subsequent calls and discussions with securities analysts) concerning continued record revenue growth and profitability and defendants' omission of any discussion of applicable known adverse factors or trends, several widely-followed Wall Street securities analysts (including analysts with US Bancorp Piper Jaffray, Chase Securities, H&Q, Legg Mason Wood Walker, Barrington Research and Robinson Humphrey) reiterated their "buy" or "strong buy"

8

recommendations for Xchange common stock, substantially raised their revenue and net income estimates for the Company, and/or substantially raised their 12-month price targets for said stock.

23. The defendants' public statements referred to in ¶21-22 above were false and misleading when made because:

  a. Defendants failed to reveal that many of the new contracts that Xchange had entered into differed substantially from the majority of those the Company historically obtained in that they required the Company to defer recognition of the substantial revenues attributable to such contracts over a period of time;

  b. Defendants failed to reveal that revenue from many of Xchange's material new contracts was contingent and could not be immediately recognized;

  c. Defendants failed to reveal that the mix of the Company's contracts had shifted and was continuing to shift from being weighted in contracts for which revenues could be immediately recognized upon execution and delivery to contracts which by their terms and nature prohibited the immediate recognition of revenue under GAAP; and

  d. Defendants failed to reveal that its expansion into new markets was forcing and would continue to force the Company to defer revenue recognition on its sales contracts contrary to Xchange's historical performance.

24. Throughout the Class Period, as XChange continued to experience increasing problems with, *inter alia*, extended delays with product sales, customer acceptance, customization, implementation and payment cycles for its service and software sales, resulting in the inability to recognize revenue upon execution and delivery of its products as it had done historically, Defendants concealed material facts concerning these problems from investors, securities analysts, XChange shareholders and the investment public, failed to correct their earlier statements that had become false and misleading in light of said problems, and continued to make falsely positive

statements concerning the Company's revenues, profitability and prospects.

25.     As late as September 29, 2000 (the last day of the Class Period), securities analysts continued to receive from Defendants and disseminate to the investing public falsely positive information about Xchange. For example, Robinson Humphrey stated in its morning recap on September 29, 2000 the following:

> We believe the recent pullback in the shares of EXAP represents an extremely attractive entry point for short and long term investors. In our opinion, EXAP has been unjustly penalized due to year end tax-loss selling by mutual funds, as well as negative sentiment created by the recent filing of an S-3 (previously restricted shareholders filing to sell stock). We do not view the filing or recent insider sales as a cause for concern and expect strong 3Q 00 results in late October to be one of many near terms catalysis for the stock. Based on our conversations with management and other sources, we believe the current quarter is running in line to ahead of expectations. We believe the company is gaining traction with its analytics product, which was rolled out this quarter, and the demand for its core eMarketing products has been strong. Our current revenue estimates for the quarter are $23.0 million and our EPS estimate of $0.06. EXAP is currently trading at 26x our admittedly conservative 2001 EPS estimate and 3.4x our 2001 revenue estimate, a substantial discount to its peer group. We continue to rate the shares of EXAP a BUY with a 6-12 month target of $40.

26.     Later in the day on September 29, 2000, *Rueters* reported the following:

> Software maker Exchange Applications, Inc. said on Friday that it expects its third-quarter earnings per share to fall short of previous forecasts. Boston-based Exchange Applications, which makes software that helps companies manage their customer relationships, said it expects a net loss ranging from 18 to 24 cents per share, compared with a loss of 1 cent in the year-earlier period. Analysts on average had forecast a per-share profit of 7 cents, according to research firm First Call/Thomson Financial. The company also said that revenues for the quarter will range between $12 million and $16 million, compared with revenues of $11.2 million a year earlier. The company cited among the factors that contributed to these results a more complicated sales process making transactions more difficult to implement, and several transactions closing in the fourth quarter instead of the third quarter as expected. Shares of Exchange

> Applications fell $3-7/16 to $9-1/4 in NASDAQ trading on Friday.
> The stocks' 52-week range is between $10-1/4 and $74-3/4.

In response to this news, the price of the Company's stock plummeted, losing nearly 60% of its value on a volume of trading that was over seven times greater than any other day during the Class Period.

27.     During the Class Period, as Xchange's common stock price rose as a result of Defendants' issuance of misleading statements, Defendants' failure to correct previous false and misleading statements and forecasts, and Defendants' concealment of material revenue delays and shortfalls during the third quarter, Defendant Frawley and several of this fellow insiders filed Forms 144 in an attempt to sell substantial quantities of Xchange common stock at prices over $20 per share, as follows:

| Date | Seller | Number of Shares | Estimated Proceeds |
|---|---|---|---|
| 9/15/00 | Haley F. Daniel (Chief Deal Officer) | 4,000 | $89,500. |
| 9/15/00 | O'Brien, Janet & John G. (Affiliated Person) | 3,800 | $85,025. |
| 9/15/00 | Borlard, Gino (Affiliated Person) | 10,500 | $220,373. |
| 9/15/00 | Frawley, Andrew J. | 25,200 | $528,899. |
| 9/15/00 | McGonagle, Michael D. (Vice President, Product Development) | 5,950 | $123,820. |
| 9/15/00 | McFarlane, David G. (Chief Operating Officer) | 10,000 | $223,750. |
| 9/15/00 | Haley, Daniel | 6,500 | $145,001. |
| 9/14/00 | O'Brien, Janet & John G. | 4,100 | $90,712. |

| 9/14/00 | Borlard, Gino | 16,500 | $368.083. |
|---|---|---|---|
| 9/14/00 | Townsend, Norman W., Jr. (Affiliated Person) | 2,650 | $58,631. |
| 9/14/00 | Frawley, Andrew J. | 37,000 | $825,403. |
| 9/14/00 | McGonagle, Michael D. | 6,750 | $150,712. |
| 9/11/00 | O'Brien, Janet & John G. | 800 | $19,600. |
| 9/11/00 | Borland, Gino | 2,900 | $68,374. |
| 9/11/00 | Townsend, Norman W., Jr. | 800 | $19,600. |
| 9/11/00 | Haley, F. Daniel | 1,000 | $23,574. |
| 9/11/00 | Frawley, Andrew J. | 6,500 | $153,254. |
| 9/11/00 | McFarlane, David G. | 2,500 | $58,939. |
| 9/08/00 | Fitzgerald, David L. | 3,500 | $72,270. |
| 8/29/00 | Fitzgerald, David, L. | 25,000 | $524,975. |

28.  On October 2, 2000, with XChange common stock having dropped to $4.25 per share (from over $28.00 at the beginning of the Class Period), Robinson-Humphrey made the following statement in the aftermath:

> On Friday, EXAP reported that 3Q00 results would be dramatically below expectations. The company expects revenue to fall in the $12-$16 million range vs. our estimate of $23 million and EPS should be a loss of $0.24 to a loss of $0.18 vs. our estimate of positive $0.06. *This report comes despite assurances from several members of management, two weeks ago, that current business trends were strong.* (emphasis added).

## COUNT I
### [Against Each Of The Defendants For Violation Of Section 10(b) Of The Exchange Act]

29.  Plaintiff repeats and realleges each and every allegation contained above.

30.  This claim is brought against each of the defendants with respect to the entire Class Period and on behalf of the Class.

31.  The defendants named in this count, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

12

continuous course of fraudulent conduct to artificially raise and maintain the artificially inflated market price of Xchange common stock during the Class Period. These defendants employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged herein, which operated as a fraud and deceit upon the market for, and purchasers of, Xchange stock during the Class Period.

32. At the time of the course of conduct alleged above, plaintiff and the other members of the Class were ignorant of the facts alleged herein. Plaintiff and the class members could not in the exercise of reasonable diligence have known the actual facts. In reliance on the integrity of the market price of these securities, plaintiff and other members of the Class were induced to and did purchase Xchange stock at artificially inflated prices. Had plaintiffs and other members of the Class known the truth, they would not have taken such action.

33. Each of the defendants, with knowledge or in reckless disregard of the fraudulent nature of the conduct complained of herein, caused and permitted the actions which are alleged to have occurred.

34. By virtue of the foregoing, each of the defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

35. Plaintiff and other members of the Class have been damaged by these defendants' violations as described in this Count and seek recovery for the damages caused thereby.

### COUNT II
### [Against The Individual Defendants For Violations Of Section 20(a) Of The Exchange Act]

36. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

37. Defendants Frawley, McFarlane, Green and Haley acted as and were controlling persons of Xchange within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, substantial stock holdings, participation in and/or awareness of Xchange's operations and/or intimate knowledge of the firm's internal workings, business

practices, procedures and shortcomings, and the actual occurrences detailed in this complaint, the Individual Defendants had the power to influence and control and/or did influence and control, directly or indirectly, the decision-making of Xchange, including the practices and efforts undertaken with respect to Xchange which plaintiff contends are deceitful. The Individual Defendants at all times had unlimited access to Xchange's internal reports and other information about the conduct alleged by plaintiff to be fraudulent, manipulative, misleading and deceitful prior to and/or shortly after these events were taking place and had the ability to prevent them from occurring or cause them to be corrected.

38.   As set forth above, XChange violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of XChange, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the wrongful conduct of the Individual Defendants, plaintiff and other members of the Class suffered damages in connection with their purchases of XChange's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of herself and the other members of the Class, pray for judgment as follows:

A.   Declaring this action to be properly maintained as a plaintiff class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, certifying the Class as defined herein above, and appointing plaintiff and her undersigned counsel to represent the class;

B.   Awarding plaintiff and the Class damages together with interest thereon;

C.   Awarding plaintiff and the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees; and

D.   Awarding plaintiff and the Class such other and further relief the Court deems just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February __, 2001

Respectfully submitted

_____
Peter Lagorio (BBO # 567379)
GILMAN & PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts 01906
Telephone: (781) 231-7850

OF COUNSEL:

Dennis Johnson
Jacob B. Perkinson
Johnson & Perkinson
1690 Williston Road
South Burlington, VT 05403
Telephone: (802) 862-0030

Ralph M. Stone
Shalov, Stone & Bonner
276 Fifth Avenue, Suite 704
New York, NY 10001
Telephone: (212) 626-8004

Counsel to Plaintiff and the Putative Class